[No. 8824. *En Banc.* August 26, 1910.]

CHARLES H. BELL, *Appellant*, v. SCRANTON COAL MINES, COMPANY et al., *Respondents.*[1]

CORPORATIONS—STOCK—SALE OF SHARES — ESCROW — CONTRACT—TRANSFER OF TITLE. A contract identifying a certificate of 10,000 shares of corporate stock, placed in escrow, to be delivered to one of the parties on expiration of the escrow, and declaring it to be his property, is an acknowledgement, as between the parties, that the title thereto is in such party.

DAMAGES—PENALTY—FORFEITURE—CONTRACTS—CONSTRUCTION. A contract for the sale of 20,000 shares of corporate stock provides for a penalty or forfeiture, which will not be enforced in equity, where it provides that 50,000 shares of stock deposited in escrow by the vendors shall be received by the vendees in case the vendors do not pay certain debts of the corporation assumed by them, whether the vendees complete the purchase or not, that it was optional with the vendees to pay said indebtedness and receive the 50,000 shares, and that if they elected not to pay the debts and decided not to purchase the 20,000 shares they were to have returned to them the purchase money paid and also receive the 50,000 shares of the vendor's stock deposited in escrow; since the shares deposited in escrow to secure payment of the debts assumed by the vendors are to be forfeited by the defaulting party at all events regardless of the different degrees of importance of the several acts, thus making the stipulated securities in some instances too large.

DAMAGES—PENALTY—NOMINAL DAMAGES. In a controversy over the title to corporate stock claimed to be forfeited on violation of a penalty, only nominal damages will be inferred in the absence of proof of actual damages.

PLEADING—ANSWER—ADMISSIONS. Where a complaint alleges that corporate stock was worth seventy-five cents to one dollar per share, and the answer denies that its value exceeds five cents per share, the

[1]Reported in 110 Pac. 628.

value stated in the answer is not admitted and taken as true for want of any reply.

CHADWICK and FULLERTON, JJ., dissent.

Appeal from a judgment of the superior court for Spokane county, Huneke, J., entered March 28, 1910, upon findings in favor of the defendants, in an action to recover corporate stock under an escrow agreement, after a trial on the merits before the court without a jury. Reversed.

*Graves, Kizer & Graves*, for appellant.

*Danson & Williams*, for respondents.

GOSE, J.—The defendants Brown, Brynton, and Reynolds, hereafter referred to as Brown, were, at the time of the making of the contract hereafter set forth in full, large stockholders in the defendant corporation, the Scranton Coal Mines Company, hereafter called the company. The company owned no property except a contract for the purchase of certain coal land from Bullock & Bullock, theretofore assigned to it by Brown. Payments were about to mature upon the contract, and the company had no funds with which to meet them. Thereupon Brown agreed to give the plaintiff 20,000 shares of the stock of the company, if he would raise $5,000 by a sale of its stock. Brown had theretofore entered into an agreement with the Bullocks whereby they agreed to sell, and Brown had agreed to buy, the coal property, and to pay therefor $34,000 and 41,600 shares of stock in a corporation to be organized, capitalized at $250,000, and divided into 250,000 shares of fully paid and nonassessable stock of the par value of one dollar each. The Bullocks agreed to execute a deed and place it in escrow, to be delivered to Brown upon payment of the purchase price of the property, time being made the essence of the contract. The plaintiff succeeded in interesting the defendants Robbins, Clodius, Turner and Turner, hereafter referred to as Robbins, in the

purchase of stock.   Whereupon the following contract was
executed by all the defendants except the bank:

"We, the Scranton Coal Mines Co., of Spokane, Wash-
ington, party of the first part, agree to sell and F. E. Rob-
bins, C. H. Clodius, James Turner and W. L. Turner agree
to buy 20,000 shares of stock of the said Scranton Coal Mines
Co., a corporation.   The parties of the second part, Turner,
Turner, Clodius and Robbins, above named, agree to pay for
the said stock the sum of $5,000, said sum to be paid as
follows:  $1,500 cash, $1,000 in ten days, $1,500 in thirty
days and the remaining one thousand in sixty days.   This
stock is to be placed in escrow in the Exchange National
Bank of Spokane, to be delivered to the parties of the second
part under the terms of this agreement.   It is further under-
stood that if the parties of the second part shall have the
right to investigate in every manner the property of this
corporation, and the corporation will aid them in every way
in so doing, and if, at the end of ten days, the representations
of Engineer Reynolds, which are made a part of this agree-
ment, are not found true, in every material part, then the
parties of the second part shall not be compelled to pay any-
thing further under this agreement and the party of the
first part herein will return to them the fifteen hundred dol-
lars already expended.   At the payment of each sum specified
herein, the Exchange National Bank shall deliver to the par-
ties of the second part, stock of the value of 25 cents a
share to the amount of the said payment.

"In consideration of this agreement, and the payment
made hereunder, the party of the first part also gives and
grants to the parties of the second part an option on 20,000
additional shares of stock at the agreed price of twenty-five
cents a share.   This stock is also to be deposited in the Ex-
change National Bank of Spokane, and the said bank is
hereby authorized to deliver any part or all of the said
20,000 shares to the parties of the second part upon their
depositing to the order on the said bank the said sum of
twenty-five cents a share.   This option extends to the first
day of September, 1908, and all stock remaining in the said
bank at that time is to be returned to the treasurer of the
company.

"At the meeting of the stockholders held on the first day
of May, 1908, the parties of the second part agree to stand

by and support Secretary and Treasurer Brown in granting this option.

"It is further understood and agreed that the company is at present indebted to Bullock & Bullock in the sum of $32,000. D. W. Brown, P. R. Brynton and H. I. Reynolds, who are to be hereinafter known as the parties of the third part, are granted and given by the company 35,000 shares out of the treasury stock of the said company. In consideration of the grant of this stock the parties of the third part agree to pay all of the indebtedness hereinbefore mentioned promptly when the same becomes due, which is as follows:

$  7,500.00 October 1st, 1908.

$12,500.00 April 1st, 1909.

$12,500.00 April 1st, 1910.

"If these sums are not paid promptly at the times herein specified when the same becomes due, it is understood and agreed that the bank herein named shall deliver the same to the parties of the second part, and the parties of the second part agree to either pay all of the debts herein specified and release the company in full, or to deliver the said 35,000 shares of stock to the corporation. In addition to this, D. W. Brown and P. R. Brynton, who are the owners of 50,000 shares of the capital stock of the corporation, hereby agree to deliver same to the bank hereinbefore specified, and if they fail to pay the debts hereinbefore assumed by them, promptly, when the said debts become due, then the bank is authorized to deliver the said 50,000 shares to the parties of the second part, and the said parties of the second part shall become the absolute owners thereof."

Thereafter Brown delivered to the plaintiff 10,000 shares of the stock and informed him that the remaining 10,000 shares were in escrow with the defendant bank. Thereupon the following writing was executed by the plaintiff and Brown:

"This Agreement made and entered into this 11th day of April, A. D. 1908, by and between D. W. Brown, party of the first part, and Chas. H. Bell, party of the second part, both residents of the city of Spokane, Wash.

"Witnesseth, That the said D. W. Brown, party of the first part, hereby acknowledges that he is the owner of ten thousand (10,000) shares of the capital stock of the Scran-

ton Coal Mines Co., a corporation organized under the laws of the state of Washington; said party of the first part hereby agrees with the said party of the second part that the said ten thousand (10,000) shares of stock above mentioned is the property of the party of the second part; further, that said stock is now placed in escrow in the Exchange National Bank of Spokane, Wash.; the said party of the first part hereby agrees to place the above mentioned stock to the peaceful possession of the party of the second part upon the expiration of the escrow agreement which expires on the 31st day of March, 1910, or sooner if the said stock is released from escrow before that date."

The 50,000 shares of stock referred to in the tripartite agreement were owned equally by Brown and Brynton. When the writing last set forth was executed, plaintiff deposited it with the defendant bank as a part of the escrow created under the writing first quoted. Later Robbins paid for the 40,000 shares of stock, paid the Bullock indebtedness upon Brown's failure to pay it, received the 35,000 shares of stock referred to in the contract, and 40,000 of the 50,000 shares of stock deposited by Brown. At the trial the defendant bank deposited with the clerk of the trial court a certificate for 10,000 shares of stock standing in Brown's name to abide the result of the suit. Both the plaintiff and Robbins assert the right to the certificate, and the plaintiff instituted this action for its recovery. The contest is between the plaintiff and Robbins, Brown having defaulted. Judgment was entered awarding the stock to Robbins. The plaintiff has appealed.

The appellant first contends that the writing executed by Brown and himself is an acknowledgment, as between them, that the title to the certificate for the 10,000 shares of stock is in the latter; whilst the respondents contend that it cannot be so regarded. We think the appellant's view is sound. The stock has been paid for and the writing segregated and identified the certificate as the property of the appellant. *Brodack v. Morsbach*, 38 Wash. 72, 80 Pac. 275.

The appellant next contends that the clause in the tripar-

tite agreement, whereby Brown deposited the 50,000 shares of stock in the respondent bank for delivery to Robbins in case Brown failed to pay the Bullock debt, is a penalty or a forfeiture. The respondents contend that "it was merely a part of the consideration for the contract," and that, if it is not so construed, it should be treated as liquidated damages. We think the appellant's view must be accepted. A reference to the contract first quoted will show, (1) that the indebtedness of $32,500 to the Bullocks was treated as the company's debt; (2) that Robbins was to receive the 50,000 shares of stock without regard to whether he paid either for the first 20,000 shares of stock or the Bullock indebtedness; (3) that it was optional with Robbins to pay or not to pay the Bullock indebtedness; and (4) that if Robbins exercised his option to not pay the Bullock indebtedness, and upon investigation found that "the representations of engineer Reynolds are not found to be true in every material part," and demanded and received the $1,500 as he had a right to do under the contract, then he would not have been a stockholder and Brown would have been penalized 50,000 shares of stock in his favor for failure to pay the Bullock indebtedness. Moreover, he would be penalized in the same sum if he made the first two payments and defaulted upon the whole or any part of the third payment, for the contract reads, "if they fail to pay the debts hereinbefore assumed by them promptly when the said debts become due, then the bank is authorized to deliver the said 50,000 shares to the parties of the second part [Robbins] and the said parties of the second part shall become the absolute owners thereof." So it will be seen that Robbins, under one contingency, although not a stockholder at all, would be invested with absolute ownership of 50,000 shares of Brown's stock without rendering any value for it. The clause is therefore a penalty, or, speaking with legal accuracy, a forfeiture. When the stipulation involves a liability for a larger sum of money only, it is a penalty; but if it involves the loss of chattels or security pledged, it is a for-

feiture. 1 Pomeroy, Equity Jurisprudence (2d ed.), § 436. Whether a penalty or a forfeiture, it will ordinarily be treated as security for the performance of the obligation of which it forms a part. Id., § 433.

"Whether an agreement provides for the performance or nonperformance of one single act, or of several distinct and separate acts, if the stipulation to pay a certain sum of money upon default is so framed, is of such a nature and effect that it necessarily renders the defaulting party liable in the same amount at all events, both when his failure to perform is complete and when it is only partial, the sum must be regarded as a penalty and not as liquidated damages." Id., § 444.

It is one of the maxims of equity that equity will not enforce a forfeiture. Id., § 459. The nature of the act to be performed and the consequences which naturally result from its violation, and all the circumstances surrounding the transaction must be considered together in determining whether the stipulation is a penalty, a forfeiture, or one for liquidated damages. "If upon the whole agreement the court can say that the sum stipulated to be paid was intended to be a penalty," the court will so treat it, without regard to how the parties have designated it. *Id.*, § 440. The following cases are illustrative of our view: *Krutz v. Robbins*, 12 Wash. 7, 40 Pac. 415, 50 Am. St. 871, 28 L. R. A. 676; *Johnson v. Cook*, 24 Wash. 474, 64 Pac. 729; *McDaniels v. Gowey*, 30 Wash. 412, 71 Pac. 12, and *Madler v. Silverstone*, 55 Wash. 159, 104 Pac. 165.

In *Krutz v. Robbins* a provision in a mortgage that, in case of default in the payment of interest or taxes, the interest rate being seven per cent payable semiannually, the mortgagors would pay interest at the rate of twelve per cent per annum compounded semiannually from the date of the note to the time of actual payment, was held to be a penalty. In *Johnson v. Cook* a bond conditioned for the payment of $3,000 if the obligors failed to erect a house upon certain property within a fixed time of the value of $2,000, and to pay all liens arising therefrom, was held to be a penalty. In

*McDaniels v. Gowey* a bond conditioned for the payment of $9,000 if the obligor failed, within six months from the date of the bond, to pay a mortgage for $4,000, taxes amounting to $19.40, and to secure the release of a right in a third party to cut timber upon the mortgaged premises, was held to be a contract of indemnity only. In *Madler v. Silverstone*, in discussing the distinction between liquidated damages and a penalty or forfeiture, we said:

"If the principal agreement contains provisions for the performance or nonperformance of several acts of different degrees of importance, and the stipulated sum is to be paid on the violation of any or all of them, and the sum will in some instances be too large, or if from an examination of the written agreement it is uncertain whether it was the intent of the parties that the stipulation was intended as liquidated damages, or as a penalty, it should be treated as a penalty."

"A penalty is a punishment imposed by law or by contract for doing or failing to do something that it was the duty of the party to do." *Haskins v. Dern*, 19 Utah 89, 56 Pac. 953.

In the absence of proof of actual damages, the law will infer nominal damages only. *Lee v. Carroll Normal School Co.*, 1 Neb. (Unof.) 681, 96 N. W. 65; *Johnson v. Cook*, *supra*. The record is silent as to damages, the respondents' position being that the contract gives them full title to the stock in controversy.

The complaint alleges that the stock is worth seventy-five cents or a dollar per share, and the answer denies that it is worth to exceed five cents per share. The respondents contend that, under the pleadings, in the absence of any evidence as to its value, the value stated in the answer must be accepted as true, citing *Griffith v. Maxwell*, 25 Wash. 658, 66 Pac. 106. That case holds that a judgment upon the pleadings can be entered only for the amount admitted to be due in the answer. It is not authority for the respondents' contention. Indeed, upon the issue the suggestion is more novel than sound. However, upon the issue before us, the

value of the property is probably immaterial.    While we have said that a penalty is ordinarily treated as a security, in this case we think that principle has no application.    The debt for the nonpayment of which Brown was penalized has been paid, and the company, the actual debtor, has been discharged from liability.    Moreover Robbins already holds 40,000 shares of the stock.    We do not think that it was intended that the stock deposited by Brown should stand as security for the payment of the indebtedness by Robbins. The contract is peculiar in several respects.    It will be noticed that Robbins purchased the first 40,000 shares at twenty-five cents a share, and that the price fixed for the 35,000 shares was nearly a dollar per share.    There is nothing in the contract which explains this inconsistency.    However, it appears from the contract as an entirety that the clause requiring Brown to deposit the 50,000 shares of stock was a penalty or a forfeiture, and as such we have seen it is unenforcible.

The decree is reversed, with directions to enter a decree for the appellant for the 10,000 shares of stock evidenced by the certificate filed with the clerk of the court.

RUDKIN, C. J., MORRIS, MOUNT, PARKER, and DUNBAR, JJ., concur.

CHADWICK, J. (dissenting)—The majority has made an exceedingly difficult case out of what seems to me to be a very simple one.    Taking the contract as a whole, its meaning is plain, and there can be no doubt that the judgment of the lower court is right.    Brown was, or at least played the part of what is known as, a "promoter"; one who puts an enterprise in motion and grabs what he can as it passes by. So far as the record shows, he was without means.    He had contracted to purchase certain mining property, and had agreed to pay Bullock & Bullock $32,000, the remainder of the purchase price, at the times mentioned in the contract exhibited in the majority opinion.    To meet this engagement he followed the usual custom of promoters.    He organized a

corporation, and into this he induced his friends Robbins *et al.* to put $5,000, and caused the company to assume his debt of $32,000.

The tripartite agreement provides that, in consideration of the grant of 35,000 shares of stock, Brown and his associates would pay the $32,000. They had no present means with which to meet this obligation; and Brown further agreed that, in case he and his associates failed to pay the purchase price of the property, and the other parties did, that they should have the 35,000 shares and 50,000 shares of their individual stock which Brown and Brynton caused to be deposited in the Exchange National Bank to insure its delivery. When it is considered that, at the time the contract was made, Robbins *et al.* were paying 25 cents per share for the stock, it is not unreasonable—in fact, it is the natural deduction from the premise—that, in the event they were called upon to pay out the $32,000 to protect the property, they should receive an amount of stock which in some degree would approximate the amount of money they had advanced. The agreement was not a *nudum pactum;* for Brown, notwithstanding the fact that the company had assumed his debt, was to be relieved of his obligation. It was still his debt so far as Bullock & Bullock were concerned. The assumption that Robbins *et al.* would receive the 50,000 shares in any event whether they paid the purchase price or not, and that the stipulation therefore operates as a forfeiture, may be disposed of in two ways:

First, Brown had a right to assume that Robbins *et al.* would pay the $32,000 which, notwithstanding the argument of the writer of the majority opinion, furnished the basis of their right to the 50,000 shares. They had paid all that had been put into the company, and Brown made his contract on the theory that they were able to pay the purchase price, and would pay it in case he did not do so. But this point, and it is this point on which the majority opinion turns, is not in the case. The fact is, they *did* pay it, and

the premise of the court's opinion could only be based upon the proposition that they were claiming the 50,000 shares without having paid the $32,000.

Second, there can be no forfeiture. It is fundamental that a forfeiture cannot occur unless a party is deprived of something. He must have something to forfeit. Brown had nothing to give up; his stock represented nothing; he had not put a dollar in the company; his interest was a chimerical hope that he might induce others to pay the purchase price, and thus clear and possibly make the remainder of his "promoter's stock" of some value; or if none was left he could step out with hope deferred but without loss of money. The agreement to surrender the 50,000 shares was by way of compensation to Robbins *et al.* in the event they were forced to pay the purchase price of the property to protect the investment of $5,000 which Brown had induced; and was not, and should not, under the facts of this case, be tortured into a penalty. If the stock of the company were the inducement of the contract, it is only fair to presume that Robbins *et al.* would, as business men, have taken it up at 25 cents per share rather than assume the risk of paying nearly a dollar a share. This the decision of the court binds them to do.

Robbins *et al.* knew nothing of plaintiff's claim that Brown's stock had been assigned to him, and should not therefore be bound by any deals between Brown and plaintiff. I know of no rule of law or equity, or even good morals, that would preserve to Brown or his assignee an equity in a property into which he had induced his friends to invest, when, in order to protect their original investment, they were compelled to secure the title to the property which he had guaranteed and without which their original investment would be a total loss.

The result of our decision is that Brown, who put in nothing and even failed to secure title to the property, takes out of his investment of nothing and the breach of his contract

10,000 shares of stock. The 35,000 and the 50,000 shares represent, and in law is, *pro rata*, the property itself, and the men who pay for the property should receive the stock; otherwise they have paid for something they have not received. I therefore dissent.

FULLERTON, J., concurs with CHADWICK, J.